UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

K.D., a minor, by and through his parent
and next friend, LAURA DIBBLE,

                                          Plaintiffs,                05-CV-0336(E)

                -vs-                                                 MEMORANDUM

FILLMORE CENTRAL SCHOOL DISTRICT                                     and
and KYLE FAULKNER, Principal of Fillmore
Central High School, individually and in his                        ORDER[1]
official capacity,
                                          Defendants.

_____


## INTRODUCTION

On May 13, 2005 K.D., a minor, through his mother Laura Dibble, filed this

action pursuant to 42 U.S.C. §1983 alleging that defendants Fillmore Central School

District and Kyle Faulkner violated his free speech, equal protection and due process

rights on October 13, 2004 when Faulkner told him that his pro-life T-shirt violated

the school's dress code and told him to remove or cover-up the T-shirt or else be sent

home from school for the day.  On June 16, 2005 K.D. filed a motion for preliminary

injunction seeking to enjoin defendants from enforcing the school dress code and

allowing K.D. to wear this particular pro-life T-shirt at school until the litigation is

finally determined.  K.D. contends that the infringement of his free speech rights

constitutes irreparable injury and that there is a significant likelihood that he will

succeed on the merits of this litigation.  On August 10, 2005 defendants filed

_____

[1] This decision may be cited in whole or in any part.

opposition to the motion arguing that K.D. has not demonstrated that he will suffer irreparable injury absent issuance of an injunction and that K.D. is not likely to succeed on the merits of his case.  The motion was argued and submitted on August 19, 2005.

## BACKGROUND

The following facts are taken from the affidavits and declarations submitted in support of and in opposition to the motion for preliminary injunction.  The majority of the facts are undisputed and, to the extent disputes of fact exist, resolution of such disputes are unnecessary to the determination of this motion.  Thus, no evidentiary hearing was or is necessary for such determination.  *See Maryland Cas. Co.* v. *Realty Advisory Bd. on Labor Relations*, 107 F.3d 979, 984 (2d Cir. 1997) ("Generally, the district court is not required to conduct an evidentiary hearing on a motion for a preliminary injunction when essential facts are not in dispute.") (internal citations omitted).

Fillmore Central School District, located in Allegany County, is comprised of one school building which houses grades pre-kindergarten through 12.  Faulkner Decl. ¶ 2.  Approximately 800 students attend the school.  *Id*. ¶ 2.  Defendant Kyle Faulkner is the Principal of Grades 5 through 12.  *Id*.  ¶ 1.  The school maintains a dress code which requires that clothing worn to the school be, among other things, "appropriate and not disrupt or interfere with the educational process."  Faulkner Decl. ¶ 4; Exhibit A to Faulkner Decl.

During the 2003-04 school year, K.D., then a sophomore, purchased the pro-life

T-shirt at issue.  K.D. Decl. ¶ 3.  The front of the T-shirt depicts, in large capital letters:

"ABORTION

IS

HOMICIDE"

The back of the shirt depicts the phrases:

"You will not silence my message.

"You will not mock my God.

"You will stop killing my generation.

"Rock for Life!"

There are no images on the T-shirt, only the above-quoted language.  *See* Exhibit A to the Complaint.

After purchasing the T-shirt during the 2003-04 school year, K.D. began wearing it to school approximately once per week.  K.D. Decl. ¶ 3.  According to Faulkner, a teacher told him about K.D.'s shirt and the teacher instructed K.D. that the shirt was not appropriate and told him not to wear it.  Faulkner Decl. ¶ 17.  Sometime during that school year, Faulkner approached K.D. and asked K.D. to "do him a favor" by not wearing that T-shirt to school.  K.D. Decl. ¶ 3; Faulkner Decl. ¶ 18.  While K.D. contends that he continued to wear the T-shirt, Faulkner contends that he was not aware of K.D. wearing the shirt for "some time."[2]  K.D. Decl. ¶ 3; Faulkner

---

[2] Whether K.D. continued to wear the T-shirt during the 2003-04 school year or acquiesced to Faulkner's request to not wear it is immaterial to the issue presented in this case and thus is a factual dispute which need not be resolved.

Decl. ¶ 18.

During the 2004-05 school year — specifically on October 13, 2004 — K.D. again wore the T-shirt to school.  K.D. Decl. ¶¶ 3-4.  Faulkner contends that he again received complaints about the shirt, this time from three female high school students who were "upset" by it.  Faulkner Decl. ¶ 19.  One student asserted that she was "upset" by the shirt and did not "want to be near him or anywhere near that shirt." Faulkner Decl. ¶ 19; A.W. Decl. at ¶¶ 4-6.[3]  Faulkner also asserted that he was aware[4] that there were female students in the school who had undergone or who had considered undergoing abortions and on reflection he concluded that each such student "would consider the shirt to be a personal attack on her, but that each girl would not likely come forward to complain."  Faulkner Decl. ¶ 19.

Faulkner advised K.D. that the T-shirt was not appropriate for school and asked him to remove it and wear a different shirt, turn it inside-out or otherwise cover its message.  K.D. Decl. ¶ 4; Faulkner Decl. ¶ 20.  Faulkner also presented K.D. with the choice to go home for the day if he refused to modify his attire.  K.D. Decl. ¶ 4; Faulkner Decl. ¶ 20.  K.D. advised Faulkner that he would not remove or cover the shirt as K.D. believed he had a constitutional right to wear the shirt.  Faulkner Decl. ¶ 20.  K.D. did not modify his clothing and his mother Laura Dibble collected him from

---

[3] K.D. contends that "at no time did my shirt cause any material disruption at Fillmore Central High School.  At no time did I receive any negative comments about my pro-life shirt from other students or teachers."  K.D. Decl. ¶ 5.  K.D. does not specifically dispute defendants' contention that students complained to Faulkner about the T-shirt.

[4] The basis of Faulkner's awareness is not set forth.

4

school.[5]  K.D. Decl. ¶ 4; Faulkner Decl. ¶¶ 20-21.  For the remainder of the school year,

fearing suspension or other disciplinary action, K.D. refrained from wearing the T-

shirt to school.[6]  K.D. Decl. ¶ 7.

Several weeks ago, the Dibble family moved out of the Fillmore Central School

District.  Faulkner Decl. ¶ 25.  The school district has granted the Dibbles' request to

allow K.D. and his younger brother to attend the school as out-of-district students.

*Ibid.*

## DISCUSSION

A party seeking a preliminary injunction must show "first, irreparable injury,

and, second, either (a) likelihood of success on the merits, or (b) sufficiently serious

questions going to the merits and a balance of hardships decidedly tipped in the

movant's favor."  *Green Party of New York* v. *New York State Bd. of Elections*, 389

F.3d 411, 418 (2d Cir. 2004) (citing *Jackson Dairy, Inc.* v. *H.P. Hood & Sons, Inc.*, 596

F.2d 70, 72 (2d Cir. 1979)).[7]

---

[5] K.D. contends that he was "suspended" from school on October 13, 2004, while defendants contend that no record of suspension exists in K.D.'s school record (Wolfer Decl. ¶ 2) and that the district did not consider him to have been suspended. Faulkner Decl. ¶ 22.  Again, the resolution of such disputes of fact is not necessary to the Court's determination as to whether a preliminary injunction should issue.

[6] It is undisputed that the dress code provides for in-school suspension of any student who refuses to modify attire found to violate the dress code and provides for out-of-school suspension for persistent violators of the dress code. *See* Exhibit A to Faulkner Decl.

[7] The parties have not addressed whether the relief sought is mandatory in nature or prohibitory in nature.  K.D. seeks to enjoin defendants from enforcing the dress code with respect to his T-shirt.  A mandatory injunction is one which alters the status quo or one which would provide the moving party with substantially all of the relief sought.  *See Tom Doherty Assocs.* v. *Saban Ent., Inc.*, 60 F.3d 27, 33-34 (2d

The infringement of First Amendment rights is generally considered to constitute irreparable injury.  *See Elrod* v. *Burns*, 427 U.S 347, 373 (1976).  However, the Court cannot assess whether K.D. has or is likely to suffer irreparable injury by virtue of the infringement of his First Amendment rights without an examination of the merits of his claim.  Therefore, the two requirements for preliminary injunction — irreparable injury and likelihood of success on the merits — must be examined together.  *See Hayes* v. *Zakia*, 2002 WL 31207463, at * 3 (W.D.N.Y. 2002) (Elfvin, J.) (examining both elements together).

In 1969, the United States Supreme Court held in *Tinker* v. *Des Moines Independent School District* that a school district could not censor a student's symbolic political speech absent material and substantial interference in the operation of the school or the infringement of other students' rights.  *Tinker* v. *Des Moines Indep. Sch. Dist.*, 393 U.S. 503 (1969).  The students in *Tinker* wore plain black armbands in protest of the ongoing war in Vietnam.  The Supreme Court held that "[c]ertainly where there is no finding and no showing that engaging in the forbidden conduct would materially and substantially interfere with the requirements of appropriate discipline in the operation of the school, the prohibition cannot be sustained."  *Id*. at 509.  The Supreme Court further stated that "conduct by the

---

Cir. 1995).  Mandatory injunctions are subject to a more stringent standard in that the moving party must show "clear" or "substantial" likelihood of success on the merits, in addition to demonstrating irreparable injury.  *See id; see also Hayes* v. *Zakia*, 2002 WL 31207463, at * 3 (W.D.N.Y. 2002) (Elfvin, J.).  The Court's ultimate conclusion is the same whether considered under the general standard for issuance of a preliminary injunction or the more stringent standard for issuance of a mandatory injunction.

student, in class or out of it, which for any reason — whether it stems from time, place, or type of behavior — materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." *Id.* at 513.

The Supreme Court further addressed student speech in *Bethel School District No. 403* v. *Fraser*, 478 U.S. 675 (1986), and *Hazelwood School District* v. *Kuhlmeier*, 484 U.S. 260 (1988).  In both *Bethel* and *Hazelwood*, the Court deviated from the *Tinker* standard.  In *Bethel*, a student made a sexually suggestive speech at a school-sponsored student assembly for student body elections.  Concluding that the school administration had not violated the First Amendment in disciplining the student after he made such a speech, the Court stated that a student's right of expression must be balanced against "the society's countervailing interest in teaching students the boundaries of socially appropriate behavior." *Bethel* at 681.  Rather than applying the *Tinker* standard, the Court concluded that where the speech at issue is lewd, vulgar and inappropriate for the maturity level of the audience, school administrators have discretion to regulate such speech.  "It is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse *** and determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board." *Bethel* at 683.

Finally, in *Hazelwood* the Court considered whether school officials could, without violating the First Amendment rights of students, remove two pages from the school newspaper after determining that two articles on those pages pertaining

to student pregnancy and the effect of divorce on students were inappropriate.  The

Supreme Court concluded that such censorship was permissible and held that

"educators do not offend the First Amendment by exercising editorial control over

the style and content of student speech in school-sponsored expressive activities so

long as their actions are reasonably related to legitimate pedagogical concerns."

*Hazelwood*, at 273.  Schools may take the emotional maturity of their students into

consideration when determining "whether to disseminate student speech on

potentially sensitive topics."  *Id.* at 271-272.

Defendants argue that the Court's decisions in *Bethel* and *Hazelwood*

constitute modifications of the *Tinker* standard and therefore defendants are not

bound to demonstrate material and substantial interference or disruption to the

school in order to prevent K.D. from wearing his T-shirt, but may regulate even this

unquestionably political speech in any reasonable manner.  Defendants assert that

they do not object to K.D.'s pro-life or anti-abortion message, but rather they object to

the "aggressive" and "confrontational" tone of the T-shirt as evidenced by the use of

the word "homicide."[8]

---

[8] Defendants point to Faulkner's Declaration as evidence that they do not
object to the pro-life viewpoint, but only the manner in which K.D.'s viewpoint is
expressed.  Faulkner asserts that he has reviewed over one hundred pro-life T-shirts,
many of which would be appropriate for K.D. to wear at school.  Faulkner Decl. ¶ 24.
Additionally, on September 1, 2005 defendants filed another Declaration of Kevin
Kearney, counsel for defendants, attaching excerpts from K.D.'s recent deposition.  At
his deposition, K.D. testified that he also has a sweatshirt which, on the front says,
"rock for life" and on the back are the same slogans that are on the back of his T-shirt
at issue.  *See* Kearney Decl., Exhibit A, p. 25, ln. 21- p. 26, ln. 3.  K.D. also testified
that he has worn his sweatshirt to school and has not been told to alter his attire.  *Id.*
at p. 26, ln. 4 - ln. 10.  He also testified that both the sweatshirt and the T-shirt

The *Hazelwood* standard applies to "school-sponsored expressive activities." *Hazelwood*, at 273.  K.D.'s attire is not such a school-sponsored expressive activity, and thus the *Hazelwood* standard does not apply to this case.  What is at issue in this case is whether defendants' prohibition of the ABORTION IS HOMICIDE" T-shirt is based on its content, in which case defendants must satisfy the *Tinker* standard, or the manner in which the content is expressed, in which case the *Bethel* standard applies.

Recently in this Circuit, the District of Vermont has confronted the same question in the school speech context.  In *Guiles ex rel. Lucas* v. *Marineau*, 349 F. Supp.2d 871 (D.Vt. 2004), the court faced the issue of whether censorship of images of drugs and alcohol on a T-shirt critical of President George W. Bush violated the First Amendment.[9]  In concluding that *Bethel* rather than *Tinker* was the appropriate standard to apply, the court found that as the school allowed most of the anti-President Bush material to remain uncovered while covering only the images of drugs and alcohol, the school was "acting pursuant to a neutral policy prohibiting dress bearing images of drugs and alcohol" and was not acting because of the content of the student's political message.  *See Guiles*, at 880.

_____

express his views on abortion.  *Id*. at p. 98, ln. 11 - ln. 15.  Defendants argue that K.D.'s deposition testimony establishes that defendants have not engaged in viewpoint or content discrimination and that there are ways in which K.D. can express his views consistent with the dress code.  That K.D. also expresses his views in other ways that are acceptable to defendants does not resolve the issue of whether he has a Constitutional right to wear the "ABORTION IS HOMICIDE" T-shirt at issue.

[9] The dress code at issue in *Guiles* prohibited, among other things, "[c]lothing displaying alcohol, drugs, violence, obscenity and racism."  *Guiles*, at 875.

The *Guiles* court distinguished the facts of its case from those in another recent school speech case, *Barber* v. *Dearborn Public Schools*, wherein a student's First Amendment rights were violated by the school when the student was prohibited from wearing a T-shirt containing the image of President George W. Bush with the caption "International Terrorist."  *See Barber* v. *Dearborn Pub. Schs.*, 286 F. Supp.2d 847 (E.D.Mich. 2003).  As its rationale for prohibiting the student from wearing the T-shirt, the school district was concerned that the T-shirt might offend Iraqi students at the school or be construed as a "personal attack" after one teacher and one student complained about the T-shirt. *Barber*, at 850.  The *Barber* court held that the *Tinker* standard applied and that the school could not prohibit the T-shirt as no evidence of disruption had been shown.  *Id*. at 856-858.

In the case at bar, based on the declaration of Faulkner, defendants assert several objections to K.D.'s T-shirt.  Faulkner asserts that the T-shirt is factually inaccurate because it claims that abortion is homicide, which is defined as an *unlawful* taking of life.  Faulkner contends that since abortion is legal, it is not an unlawful taking of life and thus the *content* of the T-shirt is inaccurate.  Next, Faulkner contends that the T-shirt constitutes a direct attack on (*i.e.*, offends) any student who has undergone or contemplated undergoing an abortion and that direct attacks on students are inappropriate in school.  Third, Faulkner asserts that the word "homicide" is objectionable because it connotes violence.  Fourth, defendants argue that abortion is a *subject* with which violence is frequently associated and thus the T-shirt discusses abortion with violent images.  Finally, Faulkner contends

that abortion is a *topic* to which elementary school students should not be exposed at school.[10]

These objections all relate to the content of K.D.'s T-shirt.  That Faulkner objects to the perceived factual inaccuracy of the T-shirt obviously relates to the T-shirt's message, not the manner in which it is relayed.  Next, the position that the T-shirt constitutes a personal attack on students who may have undergone an abortion or support the rights of women to do so, also relates to the content.  Just as the school administration in *Barber* objected to the "International Terrorist" T-shirt because some Iraqi students might be offended, here defendants object because some students may feel attacked, or offended.  That a student may have an opposing view does not make K.D.'s T-shirt a personal attack on that student for having an opposing viewpoint.

Considering Faulkner's third and fourth statements together reveals that the

_____

[10] Defendants also contend that the *Tinker* standard is not appropriately applied to student speech cases concerning the rights of elementary school children, citing *Walker-Serrano* v. *Leonard*, 325 F.3d 412 (3d Cir. 2003), and *S.G.* v. *Sayreville Bd. of Educ.*, 333 F.3d 417 (3d Cir. 2003).  In those cases, the student speakers themselves were elementary school children and the speech at issue was directed to other elementary school children.  Arguably the cases defendants cite could support the application of a flexible *Tinker* analysis, tailored to the particular educational concerns of young children.  For example, in *Walker-Serrano*, the court noted that with respect to elementary school children, schools should *facilitate* learning.  *See Walker-Serrano*, at 418.  Thus, one could argue that student speech which impedes the school's ability to facilitate learning for younger students, constitutes material disruption or interference and may be regulated in elementary schools consistent with *Tinker*.  This Court need not determine, however, the appropriate standard for regulating speech by elementary school students, or which impacts elementary schools because as discussed *infra*, defendants have failed to present any facts demonstrating or creating an issue of fact as to whether elementary school students have been exposed whatsoever to K.D.'s speech.

objectionable word here is not "homicide" but rather is "abortion."  Faulkner asserts

that abortion "is a *subject* with which violence is frequently associated" and objects

to discussion of "abortion using violent images."  Faulkner Decl. ¶ 24-D.  Because

defendants perceive abortion to be associated with violence, to accept defendants'

argument would require the prohibition of the word "abortion" as the mere mention

of the word "connotes" violence.  Moreover, use of the words "war" and "terrorism"

certainly would be prohibited by defendants as those words undoubtedly connote

violence.

These arguments demonstrate that it is, in fact, the content of K.D.'s T-shirt

which defendants regulated, and therefore the Court will apply the holding in *Tinker*

to determine whether defendants had sufficient justification for doing so.[11]

As discussed earlier, *Tinker* requires the school to demonstrate that a

student's speech will substantially interfere with the school's educational mission.

> "Certainly where there is no finding and no showing that engaging in
> the forbidden conduct would materially and substantially interfere with
> the requirements of appropriate discipline in the operation of the school,
> the prohibition cannot be sustained."

---

[11] Defendants also assert that the school dress code has been enforced for many years and no other student has challenged a determination that his or her clothing is inappropriate.  *See* Faulkner Decl. ¶ 7; Wolfer Decl. ¶ 8.  In support of defendants' contention, several students provided declarations averring that they were told to modify their clothing at some point, and that they acquiesced.  *See* A.W. Decl. ¶ 3 (fishnet stockings); M.R. Decl. ¶ 1, 7 (short skirt and fishnet stockings; statement that "Mr. Faulkner once told a girl who was wearing a pro-choice T-shirt to change the shirt, and she did.); D.T. Decl. ¶ 4 (T-shirt opposing war in Iraq worn for school pictures was prohibited and thus D.T. did not have a picture taken).  That defendants have regulated clothing lacking any political message, or even that some students may have acquiesced to changing clothing containing a political message, does not necessitate a finding that defendants could prohibit K.D.'s T-shirt.

*Id*. at 509.  Furthermore,

> "conduct by the student, in class or out of it, which for any reason —
> whether it stems from time, place, or type of behavior — materially
> disrupts classwork or involves substantial disorder or invasion of the
> rights of others is, of course, not immunized by the constitutional
> guarantee of freedom of speech."

*Id*. at 513.  The *Tinker* Court concluded that school officials had no reasonable basis

to "forecast" substantial disruption, material interference or disturbances or

disorders based on the findings that in that case

> "petitioners merely went about their ordained rounds in school.  Their
> deviation consisted only in wearing on their sleeve a band of black
> cloth, not more than two inches wide.  *** They neither interrupted
> school activities nor sought to intrude in the school affairs or the lives of
> others.  They caused discussion outside of the classrooms, but no
> interference with work and no disorder."

*Tinker*, at 514.

Clearly, K.D.'s expression of his pro-life message was political speech.  There

can also be no doubt that K.D.'s political expression was passive.  He was simply

wearing a T-shirt.  Although defendants argue that the message is "aggressive,"

there is no evidence showing that K.D. did anything more than walk through the

hallways and attend his classes while wearing the T-shirt.  He was not accosting

fellow students with buttons or flyers imprinted with his message.  *Compare*

*Blackwell* v. *Issaquena County Bd. of Ed.*, 363 F.2d 749 (1966) (upholding prohibition

of "freedom buttons" where the evidence demonstrated that students entered

classes in session, disrupting the lessons to distribute buttons, and harassed those

students who refused to wear the buttons voluntarily).  There is no evidence that

K.D. was engaging in debate with others.  He was simply wearing a shirt.  Like the

13

*Tinker* students, he merely went about his ordained rounds during the school day.

The Court credits defendants' assertions that during the 2003-04 school year a teacher found the T-shirt to be inappropriate, instructed K.D. not to wear the shirt and discussed the T-shirt with Faulkner.  The Court also credits the assertions that in October 2004 Faulkner received complaints from three female students about the T-shirt.  The complaints simply do not rise to the level of a "disruption" much less a "material and substantial interference" with K.D.'s classes or the overall administration of the school.[12]  Furthermore, defendants have not identified any infringement of the rights of any other high school student.  Certainly students do not have the right not to be "upset" when confronted with a viewpoint with which they disagree.  *See* A.W. Decl. ¶¶ 4-6.

In an effort to assert that the rights of the elementary school students have been or are likely to be infringed by K.D.'s T-shirt, defendants argue that the Court must consider the fact that the school houses all grades in one building and that, in enforcing the dress code, the school administration must consider the impact of this high school student's conduct on the elementary school students.  Defendants contend that expression that may be appropriate and protected under the First Amendment in a high school may not be appropriate for an elementary school.  In

---

[12] Defendants provided evidence that two students found K.D.'s T-shirt to be a direct attack on "any girls in the school who have had an abortion, or have considered having an abortion" (*see* A.W. Decl.¶ 5) and on "anyone who believes that a woman should have control over her own body, and on any woman who has ever had or considered an abortion."  *See* D.T. Decl. ¶ 5.  Furthermore, D.T. found the shirt to be "very offensive, and to be a major distraction."  *Ibid*.  These assertions are insufficient to satisfy the *Tinker* standard.

support of this proposition, defendants cite *Walker-Serrano ex. rel. Walker* v. *Leonard*, 325 F.3d 412 (3d Cir. 2003), .

In *Walker-Serrano*, the plaintiff, a third grade student, was prevented from circulating a petition during a quiet reading period and during recess on an icy playground.  The Third Circuit, in concluding that no First Amendment violation occurred, noted that the *Tinker* standard is a flexible one and can be tailored to suit the particular needs of elementary school children.  *Id*. at 417.  "At the very least, anything that interferes with the legitimate educational and disciplinary functions of elementary schools could be regulated under *Tinker*."  *Id*. at 417. "When officials have a legitimate educational reason — whether grounded on the need to preserve order, to facilitate learning or social development, or to protect the interests of other students — they may ordinarily regulate public elementary school children's speech."  *Id*. at 418.

Defendants contend that the younger students and the older students share facilities and hallways "and come into frequent contact."  Defendants also provide declarations from several parents of younger children in which they object to the T-shirt and assert that abortion is a topic they do not wish their children to be exposed to in school and wish to address at home.  *See* Declarations of Denise Campbell, Troy Martin, Susan Martin, Barbara Rangel, Tim Nichols, Olga Nichols, Betsy Broman Webb, Matthew Webb and Nancy Louk Murphy.[13]  While the Court appreciates the

---

[13] The objection by all these parents is to the *subject* of abortion, not the manner in which it is expressed.  Paragraph 3 of each declaration states "I believe that abortion rights are not appropriate topics for my [child] to discuss, or to be exposed to, at school.  I will discuss these

points raised by these parents, it is telling that no parent affirmed that his or her young child has seen the T-shirt.  There is no evidence of a complaint by a parent of a young child to the school administration.  There is no evidence from elementary school teachers, or even the elementary school principal,[14] demonstrating that they saw the T-shirt during the school day.

Finally, other than the vague assertions that the young students "share facilities and hallways" and "come into frequent contact" with older students, defendants have provided no facts to suggest that young students have encountered or are likely to encounter K.D. wearing his T-shirt at any time.  Although defendants would have the Court consider the potential impact this T-shirt expressing K.D.'s view in this manner could have on the youngest students at Fillmore Central, defendants have failed to identify any facts which show, or arguably could tend to show, that the young students have been exposed to the T-shirt and no indication that it posed a distraction, much less a disruption, to the educational goals of those young students.

## CONCLUSION

---

topics with my child when I believe that [he or she] is able to properly understand the difficult issues involved.  I do not want my child's initial exposure to the issue to be a T-shirt that reads, "ABORTION IS HOMICIDE" any more than I would want that initial exposure to be a poster advertising abortion rights."

[14] Kyle Faulkner asserts that he is the principal of grades 5 through 12.  Faulkner Decl. ¶ 1.  Presumably, there is an individual responsible for the administration of grades pre-kindergarten through 4.

Accordingly, K.D.'s motion for a preliminary injunction is granted, without prejudice to defendants' filing a motion for summary judgment after the conclusion of discovery, and without prejudice to any other appropriate motion.

Defendants are hereby prohibited from requiring that K.D. remove, turn inside-out or otherwise cover the "ABORTION IS HOMICIDE" T-shirt, or be faced with removal from school for the day, in-school suspension or out-of-school suspension, until such time, if ever, that the defendants demonstrate facts showing that K.D.'s wearing of the "ABORTION IS HOMICIDE" T-shirt has caused or is reasonably likely to cause a material or substantial disruption of the orderly administration of the school.


DATED:       BUFFALO, N.Y.

             September 2, 2005


                              _____/s/ John T. Elfvin____
                              JOHN T. ELFVIN
                              S.U.S.D.J.